**Rolling Meadow Ranch Groves LLC**
**6449 Camp Mack Road**
**Lake Wales, FL 33898**

**Telephone: (863)696-2409**
**Fax: (863)696-4075**

Jennifer Nicholson
National Appeals Division Director
NAD Southern Regional Office
Post Office Box 1508
Cordova, Tennessee 38088

Dear Director Nicholson,

My name is Matthew Machata, Vice President of Rolling Meadow Ranch Groves LLC (RMR). We are a family owned and operated Florida citrus company located in Lake Wales, FL. We have approximately 1,600 acres of citrus consisting of sweet oranges, tangerines, tangors, and grapefruit, with over 90% of our acreage planted to Valencia oranges. I am writing you to seek a review of Florida Farm Service Agency (FSA) State Executive Director (SED) Sherry McCorkle's determination that Rolling Meadow Ranch Groves LLC's appeal regarding multiple issues with RMR's 2017 Wildfires and Hurricane Indemnity Program (WHIP) application was not appealable. RMR wishes to appeal FSA's determination of RMR's WHIP yield, Approved Yield, Production, secondary use designation, uninsured designation, and the WHIP payment amount, primarily for RMR's Valencia orange acreage. Florida FSA ignored specific language in the WHIP regulation, 7 CFR Part 760 Subpart O, which resulted in multiple adverse decisions to RMR and also prohibited RMR from receiving disaster relief payments under the Florida Citrus Block Grant for the majority of our acres.

As I am sure you are aware, Florida citrus growers have been in a relentless battle with a devastating bacterial disease called Huanglongbing, also known as Citrus Greening. Greening has wreaked havoc on the Florida citrus industry, reducing statewide orange production from its peak in the 1997/1998 season of 244 million boxes, to just over 70 million boxes in our most recent season, a 71% reduction. Juice processing facilities and fresh packinghouses continue to shut down across the state and many growers have abandoned or sold off their citrus groves to real estate developers. The Florida Citrus industry looked like it was going to disappear just a little less than a decade ago, but some growers had the resolve to not give up and instead fought back with new production practices and outside of the box ideas. RMR was one of these growers and I can proudly say that we have successfully reversed the downward trend in Florida citrus production. RMR's current production is within 38% of its historical highs and when compared to the State's production, being within 71% of its highs, it becomes evident that RMR is ahead of the majority of growers in production recovery. This was done with large capital expenditures, thorough research, and some drastic measures that caused short-term production losses in order to gain long-term economic stability. The rapid reversal in RMR's declining production is the main source of conflict between FSA and RMR.

When Hurricane Irma hit Florida in September of 2017 it brought wind speeds of nearly 100 mph to RMR's citrus groves. The hurricane caused extensive tree and fruit damage/losses to all of RMR's citrus acreage, which is documented in the pictures shown in Exhibit A. Immediately after the storm we contacted our

insurance agency and informed them of the loss. RMR insisted on having loss adjusters conduct an appraisal of the actual loss that RMR incurred on its Valencia acres because the yields were increasing at such a rapid rate that yield loss predictions based on yearly production averages would not accurately predict RMR's real loss. The adjusters conducted ground counts and determined that RMR sustained a 40% loss of 153,376.2 boxes of Valencia oranges, which at the time had a market value in excess of $2,000,000.00. I have attached the appraiser's loss worksheet in Exhibit B.

Throughout my appeal process with FSA at the county and state levels I have been repeatedly told "this is what your industry fought for", referring to Florida Citrus Mutual fighting for the use of a five year Actual Production History (APH) to determine citrus grower's potential yield. RMR is not a member of Florida Citrus Mutual and that fight was not done on behalf of RMR. RMR is admittedly a minority compared to other citrus growers in the state because the majority of growers at the time of Irma had declining yield trends and the use of a five year average was favorable to them because it overstated their actual production, resulting in inflated payments for the majority. SED McCorkle wrote a letter to me on August 23, 2019, attached in Exhibit C, in which she states "Florida citrus growers were given the opportunity to certify their actual production for the five previous years and those certifications were meant to capture a more realistic expected yield for groves that had losses of production due to Hurricane Irma". I would like some clarification on SED McCorkles definition of "realistic" because her use of the word in that sentence does not describe the reality of the situation. When growers have declining yield trends, losses predicted by APH are higher than actual losses. The opposite occurs when growers have increasing yield trends because losses are minimized by APH, as is the case for RMR. From a mathematical point of view the use of APH in the middle of multi-season uptrends or downtrends guarantees the loss calculation will be nothing but unrealistic. This argument illustrates that FSA failed to reach its self-stated goal of capturing a realistic expected yield. RMR has no issue with growers receiving exaggerated payments because the industry is in desperate need of relief. However, RMR does take issue with the fact FSA has ignored specific language in the WHIP regulation that would have enabled RMR to be granted relief and instead has defended their misinterpretation and ignorance of the regulation by saying they applied WHIP in the same manner for all growers. Just because producers are growing the same crop does not mean they are similarly situated. There are varying circumstances for each producer based on multiple factors that determine which parts of regulations apply to each individual grower. To apply the same exact quantification of loss while ignoring factors that are required by law to be taken into account is wrong. FSA is required to follow the regulation as written and a failure to do so is adverse to RMR and to the minority of similarly situated citrus growers.

The WHIP regulation was a hastily written rule that contains errors and nonsensical statements that have allowed FSA to grant themselves unbridled discretion due to their misinterpretations and implementation of the rule. This has resulted in inequitable outcomes for program participants, such as RMR, and most likely occurred because of the manner in which the rule was made effective. The evidence of this is in the federal register Vol. 83, No. 138/ Wednesday, July 18, 2018/Rules and Regulations on page 33800 where under the Small Business Regulatory Enforcement Fairness Act (SBREFA) section, which states "**This rule is a major rule under SBREFA. SBREFA normally requires that an agency delay the effective date of a major rule for 60 days from the date of publication to allow for Congressional review. Section 808 of SBREFA allows an agency to make a major regulation effective immediately if the agency finds there is good cause to do so. The beneficiaries of this rule have suffered extensive damage due to the losses from the hurricanes and wildfires that occurred in 2017. Therefore, FSA finds that it would be contrary**

**to the public interest to delay the effective date of this rule because it would delay implementation of 2017 WHIP as required by BBA. The regulation needs to be effective to provide adequate time for producers to submit applications to request payments. Therefore, this rule is effective on the July 18, 2018."** The rule thereby was made effective on the same date it was published and bypassed SBREFA, an act that was created to give small businesses, like RMR, a voice when implementing new regulations that would affect them. By skipping the congressional review process the WHIP regulation was implemented with language that is arbitrary and capricious leaving it open to wide and varying interpretations by FSA and does not provide equitable outcomes for all producers affected. Nevertheless, I will attempt to show you where specific regulatory language was ignored and where unwarranted interpretations were made that negatively affected RMR.

I will start with the subject of FSA's determination of production and secondary use value, which were used in the WHIP payment formula. FSA determined RMR's Valencia production to be 215,475 boxes when in fact RMR's Valencia production was 231,027 boxes. FSA decided to not include RMR's Valencia oranges sold as fresh when calculating production, but instead applied a secondary use value to the oranges sold as fresh and did not account for the harvested fruit in production. If the production from the fresh fruit had counted as production, as required by the whip regulation, RMR's percent loss would have been -1.4%, instead FSA calculated a loss of 5.3%. There was no benefit to RMR in having our percent loss exaggerated by not including the fresh fruit production because it was not a large enough loss to trigger any payments from WHIP or the Block Grant. The only benefit from misrepresenting RMR's loss is to make FSA's yield loss determination seem plausible because it changes the percent loss from a negative to a positive number. If the negative loss value was used by FSA, it would mean that they believed Hurricane Irma increased RMR's production by 1.4%, which is a direct contradiction to the evidence shown in Exhibit A and the county disaster conditions established by FSA.

Under 7 CFR Part 760.1502 Definitions, Production, Secondary Use, and Secondary Use Value are defined as follows:

- **"Production means quantity of the crop or commodity produced expressed in a specific unit of measure including, but not limited to, bushels or pounds. Production under this subpart includes all harvested production, unharvested appraised production, and assigned production for the total planted acreage of the crop on the unit."**
- **"Secondary use means the harvesting of a crop for a use other than the intended use"**
- **"Secondary use value means the value determined by multiplying the quantity of secondary use times the FSA established price for that use**."

7 CFR Part 760.1502 also states **"The definitions in §§ 718.2 and 1400.3 of this title also apply, except where they conflict with the definitions in this section."** Intended use is defined in 7 CFR Part 718.2 as **"Intended use means for a crop or a commodity, the end use for which it is grown and produced."** 7 CFR Part 760.1511(d) states **"The production used to calculate a 2017 WHIP payment will be determined as specified in §§ 760.1513."**, which contains no guidance on secondary use crops. Further, 7 CFR Part 760.1511(g) instructs that **"Production from a multi-use crop will be calculated separately and summarized together."**, meaning that RMR's production should have been summarized together. This did not occur. I asked Tom Hockert, the Farms Program Chief for Florida FSA, why RMR's Valencia oranges harvested as fresh were considered secondary use and he said that it was because the fruit was insured as processed. There is nothing in the WHIP legislation that states or implies that intended use is derived

from insurance documents, so I am assuming he made this up to justify FSA's error. To back up that assumption I direct you to the WHIP Handbook that contains FSA's internal operating guidelines. Under the definition of Secondary Use from the Handbook, Par.116, it states **"The loss of quality that resulted in the commodity being marketed in a secondary use market must be because of eligible disaster conditions."** This statement shows that FSA is aware that secondary use is referring to a crop being sold at a lesser price in an alternative market because quality has been reduced to a point where it was not marketable in the intended market. Fresh Fruit generally has to be of higher quality than processed fruit and that increased quality is usually reflected in an increased price. This pricing trend is proven in crop insurance guarantees and in the FSA's fresh fruit reference price for WHIP being higher than that of processed fruit. The FSA's secondary use designation also conflicts with the more thorough definition of secondary use contained in 7 CFR 1437.3 which states **"Secondary use means the harvested production bears little resemblance to, or has a different unit of expression than, the unit of expression for the reported intended use. It does not apply to fresh and processed harvested production; is not salvage; not counted as production of the crop for the following purposes, including, but not limited to:**
**(1) The determination of whether the unit suffered requisite loss; and**
**(2) APH and approved yield."**
RMR has a large acreage of Valencia oranges and all of these oranges have the intended use of being sold for human consumption, expressed in box units, in either a fresh or processed form. RMR's decision of selling oranges as fresh or processed fruit has nothing to do with how the fruit is insured but is based on current market conditions, juice content, pounds solids per box, brix content, acid content, brix/acid ratio, size, color, uniformity, internal quality, external quality, and the availability of labor. The Valencia orange is a versatile piece of fruit that does well in both fresh and processed markets as opposed to mandarin varieties that are primarily grown for the fresh market because they do not possess the juice qualities that processors are looking for. RMR usually sells a small percentage of its Valencia orange crop for fresh when there is favorable pricing available. The harvesting window corresponding to the favorable pricing is usually too narrow to allow for all of RMR's Valencia acreage to be harvested as fresh, so the majority of the fruit gets sold as processed. Insurance designation as fresh or processed is based on historical data and reverts to processing when dealing with a case such as RMR's, in which some years the fruit is processed and other years it is sold as fresh. These are reasons why insurance is not representative of intended use in some crops and it is most likely the reason why insurance is not referenced in any of the legislated definitions for secondary use and intended use. Based on the WHIP legislation and the definitions contained therein RMR's Valencia production to be used in the WHIP calculation is 231,027 boxes. When used with the FSA's other incorrectly determined factors in the WHIP formula, RMR's loss is calculated to be -1.4%.

Now to the subjects of WHIP Yield and Approved Yield, which will lead to the issue of the uninsured designation and a plethora of other issues cascading from the poorly written WHIP rule. 7 CFR Part 760.1502 defines the following as:

- **"2017 WHIP yield means, for a unit:**
  **(1) For an insured crop, excluding crops located in Puerto Rico, the approved federal crop insurance APH, for the disaster year;**
  **(2) For a NAP covered crop, excluding crops located in Puerto Rico, the approved yield for the disaster year;**

**(3) For a crop located in Puerto Rico or an uninsured crop, excluding citrus crops located in Florida, the county expected yield for the disaster year; and**

**(4) For citrus crops located in Florida, the yield based on documentation submitted according to § 760.1511(c)(3), or if documentation is not submitted, the county expected yield."**

- **"Approved yield means the amount of production per acre, computed as specified in FCIC's Actual Production History (APH) Program in part 400, subpart G of this title or, for crops not included in part 400, subpart G of this title, the yield used to determine the guarantee. For crops covered under NAP, the approved yield is established according to part 1437 of this title."**
- **"Crop insurance means an insurance policy reinsured by FCIC under the provisions of the Federal Crop Insurance Act, as amended. It does not include private plans of insurance."**
- **"Uninsured means a crop that was not covered by crop insurance or NAP for the crop year for which a 2017 WHIP payment is being requested."**

First, I would like to point out that definition (1) for 2017 WHIP Yield states "for an insured crop", not for an APH insured crop, not for a dollar plan insured crop, not for a yield based insurance plan, not a single requirement for any specific insurance plan, just that a unit has to have crop insurance. Keep this in mind for issues that have yet to be addressed. It is also important to note that in the last sentence of the first paragraph from 7 CFR Part 760.1502, titled **"Definitions"**, it states **"In the event of conflict, the definitions in this section will apply."** This is a pretty straightforward statement that gives precedence to the meanings of words defined in this section over all other meanings of the same words defined in other sections. For citrus crops located in Florida the 2017 WHIP Yield is based on the documentation submitted according to 7 CFR.1511(c)(3). 7 CFR Part 760.1511 is titled **"Calculating payments for yield based crop losses"** and is the source of many problems with the WHIP legislation. 7 CFR Part 760.1511(c) reads as follows:

**"(c) The 2017 WHIP yield is:**

**(1) The producer's APH for insured crops under a crop insurance policy that has an associated yield and for NAP covered crops, excluding all crops located in Puerto Rico;**

**(2) The county expected yield for crops located in Puerto Rico and uninsured crops, excluding citrus crops located in Florida; or**

**(3) For uninsured citrus crops located in Florida:**

**(i) Determined based on information provided on FSA–893 and supported by evidence that meets the requirements of § 760.1513(c), or**

**(ii) If FSA–893 and supporting documentation are not submitted, the county expected yield"**

This definition of 2017 WHIP Yield clearly conflicts with the definition that has been made absolute in 7 CFR Part 760.1502. First, by changing the insurance requirements set forth in 7 CFR Part 1511(c)(1). Then, 7 CFR Part 1511(c)(3), the part that is supposed to define the 2017 WHIP Yield for Florida citrus growers, gives no guidance on what to do with Florida citrus growers who had crop insurance because it specifically states **" For uninsured citrus crops located in Florida"**. Assuming that the language of "uninsured" is an error, the insured Florida citrus grower's WHIP yield will be determined from information provided on FSA-893 that is supported by evidence that meets the requirements of 7 CFR Part 1513(c) which states: **"For all crops eligible for loan deficiency payments or marketing assistance loans (see parts 1421 and 1434 of this title) with an intended use of grain but harvested as silage, ensilage, cabbage, hay, cracked, rolled, or crimped, production will be converted to a whole grain equivalent based on conversion factors as previously established by FSA."** This caveat is completely nonsensical and has no application in

determining the evidentiary requirements related to establishing potential yield of a citrus crop, so one must assume the authors of the rule were referring to a different standard of evidence. That standard of evidence becomes apparent upon examination of the FSA-893.

The form FSA-893, attached in Exhibit D, is titled "2018 Citrus Actual Production History And Approved Yield Record (Florida Only)" and it contains six parts starting with Part A and ending with Part F. None of these parts contain definitions of the terms used on the form and even if they had those definitions would be superseded by those found in 7 CFR Part 760.1502. The evidence used from FSA-893 in determining WHIP yield comes from Part C "Actual Production History (APH)", and Part D "Approved Yield (COC Use Only)". APH is not directly defined in 7 CFR Part 760.1502, but its meaning is nested within the definition of Approved Yield which is again defined as **"Approved yield means the amount of production per acre, computed as specified in FCIC's Actual Production History (APH) Program in part 400, subpart G of this title or, for crops not included in part 400, subpart G of this title, the yield used to determine the guarantee. For crops covered under NAP, the approved yield is established according to part 1437 of this title."** Upon examining this definition of approved yield there are three options for establishing approved yield. Option 1 is to follow 7 CFR Part 400 Subpart G. Option 2 is the yield to determine the guarantee in non-APH crops. Option 3 applies to crops covered under NAP. Now we will go through the process of elimination to determine which option is applicable for defining RMR's approved yield. Option 3 is eliminated because RMR's crop was not covered under NAP. Option 2 would apply to Florida citrus because it is not traditionally an APH crop but is insured under a dollar plan of insurance, which determines the guarantee based on county yield averages. However, because WHIP mandates that Florida Citrus WHIP Yield is to be derived from APH and Approved Yield, option 2 is naturally eliminated. Now we are left with one option to define approved yield and that is to rely on 7 CFR Part 400 Subpart G, which is fittingly titled Actual Production History.

As previously discussed, the evidentiary requirements to support the validity of the information used on FSA-893 were not clearly stated in the WHIP legislation and the portion of the statute that was referenced was obviously referenced in error and does not fulfill its intended purpose. By relying on the definitions contained in 7 CFR Part 760.1502, that have been deemed to be the prevailing definitions in the event of conflict, it becomes clear that the APH and Approved Yield contained in FSA-893, must meet the standards set forth in 7 CFR Part 400 Subpart G. For citrus growers under WHIP Approved Yield is required to be computed based on the on the APH regulation and the FSA-893 simply documents that information. The following definitions from 7 CFR Part 400.51 are of great importance to citrus growers in adverse situations similar to RMR's:

- **(a) APH—Actual Production History.**
- **(e) Approved APH yield—A yield, calculated and approved by the verifier, used to determine the production guarantee and determined by the sum of the yearly actual, assigned, and adjusted or unadjusted transitional or determined yields divided by the number of yields contained in the database. The database may contain up to 10 consecutive crop years of actual and or assigned yields. At least four yields will always exist in the database.**
- **(q) Verifiable records—Contemporaneous records of acreage and production provided by the insured, which may be verified by FCIC through an independent source, and which are used to substantiate the acreage and production that have been reported on the production report.**
- **(r) Verifier—A person authorized by the FCIC to calculate approved APH yields.**

The mandate that the Approved APH Yield is to be calculated and approved by the verifier, who is a person authorized by the FCIC to calculate approved yields, is important to this situation. I'm not sure if the Polk county FSA executive director is an approved verifier by the FCIC but it is clear that he/she is required to be, most likely because the verifier must be familiar with the APH regulation and know when other aspects of 7 CFR Part 400 Subpart G may be pertinent to the producers situation. This leads to the most vital evidence in this letter that proves, beyond a reasonable doubt, that RMR was adversely affected by the decision of FSA to not follow the rules set forth in WHIP.

The APH regulation states under 7 CFR Part 400.55 (f) the following:

> **"(f) FCIC may determine approved APH yields for designated crops in the following situations:**
>
> > **(1) If less than four years of yield history is certified and T or D-Yields are not provided in the actuarial documents,**
> >
> > **(2) If actual yield exceed tolerances specified in yield variance tables, and**
> >
> > **(3) For perennial crops:**
> >
> > > **(i) If significant upward or downward yield trends are indicated;**
> > >
> > > **(ii) If tree or vine damage, or cultural practices will reduce the production level;**
> > >
> > > **(iii) If more than two percent of the trees or vines have been removed within the last two years; or**
> > >
> > > **(iv) If yield trends are evident and yields greater than the average yield are requested by the insured."**

This legislation allows for RMR to contest the absurd determination by FSA that RMR's production increased by 1.4% when struck by one of largest hurricanes to make landfall in recent history. Citrus is a perennial crop and RMR's yield history and yield trends fulfill two of the four criteria that allows for the FCIC to determine approved yield, where only one criterion needs to be satisfied. I have attached RMR's FSA-893 Form for Valencia acres in Exhibit E. RMR's APH yield percent increase for each APH year starting at 2013 and going through 2014, 2015, 2016, and 2017 is -47%, -39%, -15%, and 77% respectively. This is indicative of significant upward and downward yield trends, satisfying criterion one. RMR's APH yield for 2018 and 2019 is 226.27 and 300.9 boxes per acre, respectively. This gives an APH yield percent increase starting at 2016 through 2017, 2018, and 2019 of 77%, 1%, and 32%, respectively. Keep in mind the 1% increase occurred during the crop year Hurricane Irma struck and the 32% increase occurred the season after Irma, while the trees were still recovering from the long term effects of the hurricane. Even with the setbacks from Irma RMR was able maintain a positive yield trend over a four year period which satisfies the fourth criterion listed for FCIC yield determination. I am requesting FSA to adjust RMR's WHIP Yield in accordance with 7 CFR Part 400, as mandated by the WHIP regulation.

In SED McCorkle's letter she argues that equitable relief was not granted to RMR because there was no failure to follow procedure by the Polk County FSA Committee (COC) and that if the COC had requested equitable relief, they would have been asking for RMR's application to receive advantageous implementation that no other grower who applied for WHIP would have received. I have shown you how procedure was not followed according to the WHIP regulation and if FSA contests that the procedures followed were mandated in the FSA Handbook for WHIP, I would remind them that the Handbook states under the **"Limitations"** section on page 1-2 that **"This handbook constitutes FSA's internal operating guidelines issued by DAFP for carrying out WHIP regulations. Handbook provisions are considered**

**interpretive of regulations. Whenever an unintended conflict appears to exist between any handbook provision and the pertinent applicable Federal regulations, regulations apply."** The excuse from the SED that RMR would have received advantageous implementation that no other grower would have received is erroneous because the handbook gave guidance to the COC that conflicted with the WHIP regulation. Thus there are other citrus growers, similarly situated to RMR, that have been adversely affected by the false interpretations of FSA.

FSA's interpretation of the WHIP regulation is discriminatory towards the minority of citrus growers with increasing yield trends. The evidence of discriminatory behavior is contained in the WHIP Handbook on page 10-19 and in Exhibit 10 page 2, this evidence is attached to this letter in Exhibit D. These pages are the only examples of the FSA-893 Form contained in the WHIP Handbook. Notice, that all three examples are different but have one thing in common, consecutive declining yields across all APH crop years. This indicates that the FSA intentionally interpreted and implemented the regulation in a way that exaggerates losses for the majority and minimizes losses for the minority. RMR's losses were minimized so severely that they went negative. SED McCorkle's assertion that the five year APH was meant to capture a more realistic yield was disingenuous and disturbing because the evidence shows that she and/or her office were well aware of how FSA's interpretation of WHIP was going to produce advantageous and unrealistic expected yields for growers with declining yields. I hope this is not an indication that Florida FSA is beholden to certain special interest groups that have ensured they will receive the maximum benefit from WHIP at the expense of other producers. The WHIP rule as written allows for the minority of growers negatively affected by FSA's misinterpretation to receive relief under WHIP and the Block Grant. Following the rule as written may also force growers that have extreme downward yield trends to have a reassessed approved yield that is more in line with their current production, which would be appropriate in cases where excessive payments were collected on groves with minimal caretaking. Although this is not RMR's intention, it may be the reason why FSA has stood by their misinterpretations, even when they are not backed up by legislation.

When I started the WHIP appeal process I thought it would be obvious that RMR had been adversely affected by FSA's interpretation of WHIP and hoped they would quickly rectify the situation. I was thoroughly surprised at their reaction and their unwillingness to help farmers that could clearly prove that they sustained losses during Hurricane Irma. By the way the WHIP program has been interpreted and implemented by FSA, growers who have put the time and money into turning their groves around are getting left empty handed while those who have done nothing, but to accept defeat in the face of Greening, are receiving the greatest benefit. All Florida citrus growers affected by Hurricane Irma should be entitled to relief. In conclusion, I will list the key points of contention that I have presented to you in this letter.

1. The WHIP regulation contains errors and nonsensical statements that are arbitrary and capricious leaving the rule open to wide and varying interpretations.
2. FSA's false interpretation of the WHIP regulation gave them unbridled discretion, which was used to justify the ignorance of statutes and procedures that were put in place to provide equitable outcomes for program participants.
3. FSA has interpreted the WHIP rule to favor one group of citrus growers over another, which is discriminatory in nature.

4. When implemented as written the WHIP regulation allows equitable relief for all Florida citrus growers, not just those with decreasing or stagnated yield histories.
5. FSA calculated RMR's 2017/2018 Losses, Secondary Use, Approved Yield, WHIP yield, Production, APH, and WHIP Payment in a way that does not comply with the prevailing regulations.
6. FSA has denied RMR relief under WHIP and the Florida Citrus Block Grant.

I am grateful for you taking the time to read this letter and hope these issues can be resolved as quickly as possible.

Sincerely,

Matthew Machata
Vice President
Rolling Meadow Ranch Groves LLC
Office: (863)696-2409
Cell: (863)528-3541

Exhibit A















































**Exhibit B**

# ADJUSTER'S CITRUS WORKSHEET

Company Name: AGRI GENERAL INSURANCE COMPANY

| 1. Insured's Name | 2. Policy No. | 3. Claim No. | 4. Unit No. | 5. Commodity/Group | 6. Commodity Type | 7. Practice |
|---|---|---|---|---|---|---|
| ROLLING MEADOW RANCH GROVE LLC | MF-0714756 | 17-001674 | 2.00 9U | ORANGES/LTSNJ | LTSNJ 1290 | 9970 |

| 8. Intended Use | 9. Crop Year | 10. Acres | 11. No. of Trees | 12. No. of Trees Harvested | 13. Inspection Type | 14. Inspection Date |
|---|---|---|---|---|---|---|
| JUICE 114 | 2017 | 1,049.0 | 184,721 | 184,721 | Preliminary | 11/14/2017, 11/07/2017, 11/15/2017, 11/16/2017 |

## SECTION I - FRUIT LOST ON GROUND

| Grove ID. 15. | No. of Trees 16. | Fruit Size Per Box 17. | Ground Fruit Per Tree 18. | Boxes Lost Per Tree (18 ÷ 17) 19. | Cause(s) of Damage 20a. | Date(s) of Damage 20b. | Boxes Produced (16 x 19) 22. | Boxes Lost (from Col. 21) 23. |
|---|---|---|---|---|---|---|---|---|
| 90 III | 362 | 202 | 159.5 | 0.8 | Hurricane/Tropical Depression | 09/11/2017 | 289.6 | 289.6 |
| BASSETT V | 5,626 | 202 | 155.5 | 0.8 | Hurricane/Tropical Depression | 09/11/2017 | 4500.8 | 4500.8 |
| | | | | | | | | |
| 21. TOTAL | 194,066 | | | | | 24. TOTALS | 153,099.9 | 153,099.9 |

## SECTION II - FRUIT ON TREE, PRODUCTION AND LOSS (HAIL/WIND-SCAR AND FREEZE CUT DETERMINATION METHODS)

| Grove ID. 25. | No. of Trees 26. | Cause(s) and Date(s) of Damage 27. | Fruit Size Per Box 28. | On-tree Fruit Count/Tree 29. | Boxes Lost Per Tree (29 ÷ 28) 30. | No. of TEN 31. | Col. 31 x 0.7 32. | No. of 40% 33. | Col. 33 x 0.4 34. | % Damage 35. | Boxes Produced (26 x 30) 36. | Boxes Lost (36 x 35) 37. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 90 III | 362 | Hurricane/Tropical Depression 09/11/2017 | | | Trees not harvested | | | | | | | |
| BASSETT V | 5,626 | Hurricane/Tropical Depression 09/11/2017 | | | Trees not harvested | | | | | | | |
| | | | | | | | | | | | | |
| 31. TOTAL | | | | | | | | | | 32. TOTALS | | |

## SECTION III - FRUIT PRODUCTION AND LOSS BASED ON DATA FROM TEST HOUSE JUICE ANALYSIS

| Grove ID. 40. | Lbs. Solids 41. | Date Harvested 42. | Name of Processing Plant 43. | Avg. Lbs. Juice/Box 44. | Juice Base Lbs./Box 45. | Lbs. Solids/Box 46. | Juice Fruit 47. | Fresh Fruit Factor 48. | Fresh Solids 49. | % Decay 50. | % Damage 51. | Boxes Produced 52. | Boxes Lost 53. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| 54. TOTAL | 217,251.0 | | | | | | | | | | 55. TOTALS | 222,292.5 | 5,066.7 |

## SECTION IV - TOTAL PRODUCTION AND PRODUCTION LOST

| 56. Grove ID. | 57. Date Harvested | 58. Name and Address of Buyer or Packer (Fruit Harvested Before Damage Occurred, Within 7 Days After Freeze, Or Prior To Inspection or Damage by Uninsured Causes) | 59. Boxes Produced | 60. Boxes Lost |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 61. Coverage Level Percent Deductible | 0.500 | 62. Production Lost Uninsured Causes | | 63. Subtotals | 388,944.4 / 158,166.6 |
| 64. Box Increase to meet Minimum Boxes Per Acre | | 67. Adjusted Percent Loss | | | -0.093 |
| 65. Total Boxes Produced | 388,944 | 68. Adjusted Percent Damage | | | |
| 66. Percent Boxes Lost | 0.407 | 69. Dollar Amount of Insurance Per Acre | | | 567 |
| 70. Insured's Signature [signature] | Date 06/18/2018 | 71. Adjuster's Signature [signature] | Code No. 4FE | Date | 06/18/2018 |

FNCIS-M 314_Rev 11-2013 (See Reverse Side for Required Statements) 72. Page 2 of 2

Exhibit C

USDA

United States
Department of
Agriculture

Farm and
Foreign
Agricultural
Services

Farm
Service
Agency

**Office of the
State Director**

Florida/Virgin Islands
4440 NW 25th Place,
Ste 1 (32606)

P.O. Box 141030
Gainesville, FL
32614-1030

(352) 379-4500
Fax (352) 379-4580

September 23, 2019

Rolling Meadow Ranch Groves LLC
ATTN: Matthew Machata
6449 Camp Mack Road
Lake Wales, FL 33898

Dear Mr. Machata,

This letter is in response to your letter dated August 25, 2019 requesting me as SED to overturn the Polk County FSA Committee's (COC) determination that your 2017 Wildfires and Hurricane Indemnity Program (WHIP) application is non appealable.

I understand your position to be that the COC incorrectly determined your expected yield of Valencia oranges because they used the information provided by you showing the five previous year's production and because they denied you an appeal, the COC also denied equitable relief.

The regulations governing WHIP calculations for yield base crops as they apply to Florida citrus are found at 7 CFR Part 760.1511 (c) (3). Those regulations read as follows:

*(3) For uninsured citrus crops located in Florida:*

*(i) Determined based on information provided on FSA-893 and supported by evidence that meets the requirements of §760.1513(e); or*

*(ii) If FSA-893 and supporting documentation are not submitted, the county expected yield*

I understand you had insurance in 2017 however, like all other Florida citrus growers you had a Dollar Plan which does not keep records for Actual Production History (APH) purposes. Florida citrus growers were the only WHIP applicants nationwide, who had Dollar Plans, that were not required to accept the County Expected Yield (CEY) for calculating WHIP benefits. Florida citrus growers were given the opportunity to certify their actual production for the five previous years and those certifications were meant to capture a more realistic expected yield for groves that had losses of production due to Hurricane Irma.

I do not agree that the COC denied equitable relief to you. Equitable relief is most commonly used when an applicant failed to comply with program provisions however, the failure was due to meritorious issues outside of the applicant's control. In this case, there was no failure to follow procedure. If the COC had requested equitable relief, they would have been asking for your application to receive advantageous implementation that no other Florida citrus grower who applied for WHIP would have received. The COC merely chose not to consider equitable relief.

I have determined that the issue is not appealable. You may seek a review of this determination by filing, with the National Appeals Division (NAD) Director, a written request no later than 10 calendar days after the date you receive this notice according to the NAD appeal procedures found at 7 CFR Part 11. If you believe that this issue is appealable, you must write to the NAD Director at the address shown and explain why you believe this determination is appealable. If you choose to seek an appealability review with the NAD Director, provide FSA a copy of your request.

NAD Southern Regional Office
Post Office Box 1508
Cordova, Tennessee 38088

You may also contact the NAD Director on the NAD website at www.nad.usda.gov.

Sincerely

Sherry McCorkle
State Executive Director
Florida Farm Service Agency

Exhibit D

Exhibit 10
(Par. 188)

**FSA-893, 2018 Citrus Actual Production History and Approved Yield Record (Florida Only) (Continued)**

**B Example of Completed FSA-893**

This form is available electronically.

**FSA-893**

OMB Control No. 0560-0291

U.S. DEPARTMENT OF AGRICULTURE
Farm Service Agency

2018 CITRUS ACTUAL PRODUCTION HISTORY AND
APPROVED YIELD RECORD
(FLORIDA ONLY)

**PART A - GENERAL INFORMATION**

| 1. State | 2. County | 3. |
|---|---|---|
| 4. Producer's Name | | |

**PART B - CROP INFORMATION**

| 5. Crop Name | 6. Crop Type | 7. Intended Use | 8. Practice | 9. Organic Status | 10. Unit of Measure |
|---|---|---|---|---|---|

**PART C – ACTUAL PRODUCTION HISTORY (APH)**

| 11. APH Crop Year | 12. Planted Acres | 13. Actual Production | COC USE ONLY 14. Yield |
|---|---|---|---|
| 2017 | | | |
| 2016 | | | |
| 2015 | | | |
| 2014 | | | |
| 2013 | | | |

**PART D - APPROVED YIELD (COC USE ONLY)**

| 15. Total Yield (Item 14) | 16. No. of APH Crop Years (Item 11) | 17. Calculated Yield |
|---|---|---|

**PART E - PRODUCER'S CERTIFICATION**

18. Remarks

| 19A. Signature of Producer (By) | 19B. Title/Relationship of the Individual Signing in a Representative Capacity | 19C. Date (MM-DD-YYYY) |
|---|---|---|

**PART F - COC SIGNATURE**

| 20A. Signature of COC Representative | 20B. Date (MM-DD-YYYY) |
|---|---|

NOTE: [illegible]

RETURN THIS COMPLETED FORM TO YOUR COUNTY FSA OFFICE.

**D Calculating Florida Citrus Yields**

Participants will certify production harvested and acres grown for the previous 5 crops years. A simple average will be calculated to determine the yield that will be used in the WHIP calculation. All yields and acreage provided must be for continuous years.

**Example 1:** Participant has owned 100 acres of citrus since 1990. Participant applied for WHIP for 2018 citrus losses due to Hurricane Irma. The participant will certify to production for 2017, 2016, 2015, 2014 and 2013. However in 2013 he only owned 75 acres. The additional 25 acres was purchased prior to harvest season in 2014.

**PART B – CROP INFORMATION**

| 5. Crop Name | 6. Crop Type | 7. Intended Use | 8. Practice | 9. Organic Status | 10. Unit of Measure |
|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

**PART C – ACTUAL PRODUCTION HISTORY (APH)**

| 11. APH Crop Year | 12. Planted Acres | 13. Actual Production | COC USE ONLY 14. Yield |
|---|---|---|---|
| 2017 | [illegible] | [illegible] | [illegible] |
| 2016 | [illegible] | [illegible] | [illegible] |
| 2015 | [illegible] | [illegible] | [illegible] |
| 2014 | [illegible] | [illegible] | [illegible] |
| 2013 | [illegible] | [illegible] | [illegible] |

**PART D – APPROVED YIELD (COC USE ONLY)**

| 15. Total Yield (Item 14) | | 16. No. of APH Crop Years (Item 11) | 17. Calculated Yield |
|---|---|---|---|
| [illegible] | divided by | [illegible] | [illegible] |

**Example 2:** Participant purchased a 20 acre grove in 2015. Participant applied for WHIP for 2018 citrus losses due to Hurricane Irma. The participant will certify to production for 2017, 2016 and 2015 crop years for the 20 acre grove.

**PART B – CROP INFORMATION**

| 5. Crop Name | 6. Crop Type | 7. Intended Use | 8. Practice | 9. Organic Status | 10. Unit of Measure |
|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

**PART C – ACTUAL PRODUCTION HISTORY (APH)**

| 11. APH Crop Year | 12. Planted Acres | 13. Actual Production | COC USE ONLY 14. Yield |
|---|---|---|---|
| 2017 | [illegible] | [illegible] | [illegible] |
| 2016 | [illegible] | [illegible] | [illegible] |
| 2015 | [illegible] | [illegible] | [illegible] |
| 2014 | | | |
| 2013 | | | |

**PART D – APPROVED YIELD (COC USE ONLY)**

| 15. Total Yield (Item 14) | | 16. No. of APH Crop Years (Item 11) | 17. Calculated Yield |
|---|---|---|---|
| [illegible] | divided by | [illegible] | [illegible] |

If the participant purchased the grove in 2018, prior to the eligible disaster event and previous year's production are not available from prior owners of the grove, then the participant would be eligible however, the CEY would be used as the yield for the WHIP calculation.

Exhibit E

This form is available electronically.

FSA-893
(07-13-18)

U.S. DEPARTMENT OF AGRICULTURE
Farm Service Agency

OMB Control No. 0560-0291
OMB Expiration Date: January 2019

RECEIVED
JUL 31 2018
POLK CO FSA OFFICE

## 2018 CITRUS ACTUAL PRODUCTION HISTORY AND APPROVED YIELD RECORD (FLORIDA ONLY)

**PART A – GENERAL INFORMATION**

| 1. State | 2. County | 3. Unit No. |
|---|---|---|
| Florida | Polk | 0002 0800 |

4. Producer's Name
Rolling Meadow Ranch Groves LLC

**PART B – CROP INFORMATION**

| 5. Crop Name | 6. Crop Type | 7. Intended Use | 8. Practice | 9. Organic Status | 10. Unit of Measure |
|---|---|---|---|---|---|
| Citrus | Valencia | [redacted]Processed | | Conventional | Boxes |

**PART C – ACTUAL PRODUCTION HISTORY (APH)**

| 11. APH Crop Year | 12. Planted Acres | 13. Actual Production | 14. Yield (COC USE ONLY) |
|---|---|---|---|
| 2017 | ~~[illegible]~~ 1020 | 228023 | ~~192.98~~ 224.35 |
| 2016 | ~~[illegible]~~ 1053 | 133168 | ~~113.19~~ 126.47 |
| 2015 | ~~[illegible]~~ 947 | 140829 | ~~118.64~~ 148.71 |
| 2014 | ~~[illegible]~~ 927 | 173877 | ~~156.48~~ 187.57 |
| 2013 | ~~[illegible]~~ 1103 | 386303 | ~~325.95~~ 350.77 |

**PART D – APPROVED YIELD (COC USE ONLY)**

| 15. Total Yield (Item 14) | 16. No. of APH Crop Years (Item 11) | 17. Calculated Yield |
|---|---|---|
| ~~896.04~~ 1037.87 divided by | 5 = | ~~179.21~~ 207.57 |

**PART E – PRODUCER'S CERTIFICATION**

18. Remarks

*I hereby certify that the information included on this form includes a complete and accurate record of actual production history. The actual production history is accurately identified to the unit, crop and crop years shown. I understand that the information on this form may be spot checked and failure to certify accurately may result in a loss of program benefits. Additionally, I direct the purchaser, warehouse operator, ginner, or any person who otherwise stores or purchases crop production identified on this form to disclose those storage or purchase records of the identified crop to USDA representatives for the purpose of verification of production. I understand that the payment yield may be different than the approved yield if the unit acreage increases or plant density changes.*

| 19A. Signature of Producer (By) | 19B. Title/Relationship of the Individual Signing in a Representative Capacity | 19C. Date (MM-DD-YYYY) |
|---|---|---|
| [signature] | Matthew Machata/Operations Manager | 7/31/18 |

**PART F – COC SIGNATURE**

| 20A. Signature of COC Representative | 20B. Date (MM-DD-YYYY) |
|---|---|
| Marcuida Kesterer CED | 10/30/18 |

NOTE: The following statement is made in accordance with the Privacy Act of 1974 (5 USC 552a – as amended). The authority for requesting the information identified on this form is 7 CFR Part 760, subpart D, and the Bipartisan Budget Act of 2018 (Pub. L. 115-123). The information will be used to determine eligibility for program benefits. The information collected on this form may be disclosed to other Federal, State, Local government agencies, Tribal agencies, and nongovernment entities that have been authorized access to the information by statute or regulation and/or as described in applicable Routine Uses identified in the System of Records Notice for USDA/FSA-2, Farm Records File (Automated).

Public Burden Statement (Paperwork Reduction Act): Public reporting burden for this collection is estimated to average 5 minutes per response, including reviewing instructions, gathering and maintaining the data needed, completing (providing the information), and reviewing the collection of information. You are not required to respond to this collection or FSA may not conduct or sponsor a collection of information unless it displays a valid OMB control number. **RETURN THIS COMPLETED FORM TO YOUR COUNTY FSA OFFICE.**

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov. USDA is an equal opportunity provider, employer, and lender.

KS 12/21/18