UNITED STATES DEPARTMENT OF AGRICULTURE
OFFICE OF THE SECRETARY
NATIONAL APPEALS DIVISION

| | | |
|---|---|---|
| In the matter of | ) | |
| | ) | |
| ROLLING MEADOWS RANCH GROVES, LLC | ) | NAD Case No. 2020S000051 |
| | ) | |
| and | ) | |
| | ) | |
| FARM SERVICE AGENCY | ) | |
| | ) | |
| | ) | |

---

## APPEAL DETERMINATION

Rolling Meadows Ranch Groves, LLC (RMR or Appellant) appeals the Wildfires and Hurricanes Indemnity Program (WHIP) payment amount that it received from the Farm Service Agency (FSA or Agency) for RMR's Valencia orange crop losses caused by Hurricane Irma in September 2017. The Agency calculated RMR's payment by taking a simple average of its previous 5-year Approved Production History (APH) to project its WHIP expected yield. After completing its yield calculations by adding the value of RMR's Valencia crop sold as processed for juice and deducting the sum of the dollar amount of RMR's secondary use crop sold as whole oranges, fresh, the Agency determined that RMR qualified for a $0 WHIP payment.

RMR disputes the Agency's decision to calculate its WHIP payment by using its 5-year production history and deducting the sum of the dollar amount of RMR's fresh Valencia crop as a secondary use crop. RMR contends that its 5-year production history does not accurately reflect its projected yield because citrus greening reduced its historical yields. RMR contends that its current yield trend is increasing because of the efforts that it took to combat citrus greening, and its efforts have reversed its past downward trends in production. RMR points out that that the Agency used the wrong regulations to calculate its WHIP payment because the regulations that the Agency used clearly indicate that they only apply to uninsured crops and RMR had insured crops. RMR points out that it retained loss adjusters to appraise its actual loss, and the Agency should have used their crop insurance appraisal report to project RMR's yield since that was the best data available to project its yield potential. RMR also argues that its Valencia fresh crop sells for more than its processed crop, which means that its fresh crop does not meet the Agency's definition of a secondary use crop. Lastly, RMR also seeks equitable relief by arguing that the Agency used the incorrect rules to calculate its WHIP payment, its production is increasing, and the $0 WHIP payment in the Agency's calculations does not accurately reflect its loss that exceeded 2 million dollars.

RMR requested an in-person hearing, and I held the first hearing on short notice on December 4, 2019, one week after the pre-hearing. [1] I held a second final hearing on January 6, 2020, to fully develop the record by resolving conflicts in the evidence. Based on the evidence and applicable rules and regulations, I conclude that the Agency's decision is erroneous. The rationale supporting my decision follows:

## STATEMENT OF THE ISSUES

The dispute that I had to resolve in this appeal was whether the Agency applied the correct methods in determining the amount of RMR's WHIP payment. To resolve this dispute, I had to answer the following questions:

1. Did the Agency apply the correct rules and regulations when it calculated RMR's WHIP payment?

2. Was RMR's average yield from its 5-year APH the best data available to the Agency to calculate RMR's WHIP payment?

3. Did the Agency correctly deduct the dollar amount of RMR's crop sold as fresh because it was a secondary use crop?

4. What are RMR's arguments for equitable relief?

## BACKGROUND

Pursuant to provisions of the 2018 Bipartisan Budget Act, Pub. L. 115-123, 132 Stat. 65-66 (Feb. 9, 2018), the United States Department of Agriculture (USDA) implemented the 2017 WHIP to provide assistance for agricultural losses related to wildfires and hurricanes that occurred in 2017. FSA administers the program. *See also* Title 7 of the Code of Federal Regulations (7 C.F.R.) Part 760 Subpart O Sections §§ 1500-1517 (July 18, 2018).

## FINDINGS OF FACT (FOF)

Based upon the evidence before me, I find the following:

---

[1] I held the first hearing on short notice after the pre-hearing because of RMR's concern that the WHIP funds would not be available after 2019. RMR indicated that it has been communicating with the appropriate persons at the United States Department of Agriculture National Office to determine the status of the WHIP funding after 2019, but as of the date of the hearing, RMR had not received a definitive answer to its concerns.

1. RMR is a family owned and operated Florida citrus company located in Lake Wales, Florida. RMR has approximately 1,600 acres of citrus consisting of sweet oranges, tangerines, tangors, and grapefruits, with over 90 percent of its acreage planted to Valencia oranges equaling 1,097.200 acres. (Hearing Audio, Track 1, 20:00-21:39; Appellant Exhibit H, page 1)

2. Most of the Valencia oranges that RMR sells are sold as processed oranges for juice. RMR also sells some of its Valencia crop as fresh when the market conditions are favorable for whole Valencia oranges. (Hearing Audio, Track 1, 20:00-21:39; Hearing Audio, Track 2, 10:53-12:12; Appellant Exhibit H, page 1)

3. In 2017, RMR had catastrophic insurance policies for its citrus acreage. RMR had dollar plans that covered both its Valencia processed and fresh oranges under one unit with the single intended use listed as processed. The Agency informed RMR that the Agency had to use the same "intended use" in the Agency's computer system that RMR selected to insure its processed and fresh oranges; therefore, RMR filed acreage reports with the Agency reporting the intended use for its Valencia acreage as processed oranges. (Hearing Audio, Track 1, 01:26:30-01:29:00; Hearing Audio, Track 2, 09:36-10:45)

4. Less than 10 years ago, the Florida citrus industry was on the verge of disappearing because of citrus greening that destroyed citrus trees in Florida.[2] To combat citrus greening, RMR implemented farming practices recommended by the University of Florida Institute of Food and Agricultural Sciences (UF/IFAS), and recommendations from other industry experts on what citrus growers needed to do to save the future viability of their citrus groves. RMR discovered that it was able to combat citrus greening by changing the root-to-shoot ratio, which was cutting back the citrus tree limbs to decrease the canopy and increase the ability of the root system to sustain the canopy. Changing the root-to-shoot ratio resulted in large short-term losses in production in the beginning years because it decreased the size of the canopy that bore the fruit.[3] (Hearing Audio, Track 1, 20:00-25:55)

5. The farming practices that RMR used to combat citrus greening eventually proved very productive. RMR's production increased 131.5 percent from the lows that it experienced during the 2015/2016 growing season. (Hearing Audio, Track 1, Appellant Exhibit A, page 2)

[2] Huanglongbing, commonly known as citrus greening, is a bacterial disease that almost destroyed the Florida citrus industry. RMR explained that citrus greening reduced the statewide orange production from its peak in the 1997/1998 season of 244 million boxes, to just over 70 million boxes recently. (Appellant Exhibit H, page 1)

[3] RMR also testified that spoon-feeding its trees helped it to combat citrus greening.

6. In September 2017, Hurricane Irma made landfall in Florida and produced wind speeds nearing 100 miles per hour near RMR's citrus groves. The hurricane caused RMR to suffer extensive tree and fruit damages/losses to all RMR's citrus acreage. (Hearing Audio, Track 1, 27:26-29:41)

7. Immediately after Hurricane Irma, RMR contacted its crop insurance agent and requested its loss adjusters to conduct an appraisal of the actual loss that RMR incurred on its Valencia acres. On November 7, 2017, November 14, 2017, November 15, 2017, and November 16, 2017, the loss adjusters counted the number of Valencia oranges on the ground, and after using their formula to calculate dollar plan losses, the loss adjusters determined that RMR suffered a 40 percent loss of production, which equaled 158,166.6 boxes of Valencia oranges having a market value greater than 2 million dollars. (Hearing Audio, Track 1, 52:18-56:50; Hearing Audio, Track 2, 16:10-18:58; Appellant Exhibit A, page 2)

8. To receive WHIP payments from the Agency for its Valencia crop losses, RMR filed form FSA-890, *WHIP Application and Notice of Loss,* or NOL. RMR filed separate NOLs for its other citrus crops. (Agency Records, pages 1- 41)

9. Most Florida citrus growers at the time of Hurricane Irma had declining yield trends. Florida Citrus Mutual (Mutual) lobbied Congress and the Agency to create a provision in the WHIP regulations for Florida citrus growers to use an average of their 5-year APH, instead of the County Expected Yield (CEY), as the method in determining the approved average yield in calculating WHIP payments.[4] (Hearing Audio, Track 1, 01:51:32-01:52:57; Appellant Exhibit H, pages 1-2)

10. On October 30, 2018, RMR certified its actual 5-year production history by signing form FSA-893, *2018 Citrus Actual Production History and Approved Yield Record Florida Only*. RMR's FSA-893 contained the following amounts:

| Part B - Crop Information | | | | | |
|---|---|---|---|---|---|
| 5. Crop Name Citrus | 6. Crop Type Valencia | 7. Intended Use Processed | 8. Practice | 9. Organic Status Conventual | 10. Unit of Measure Boxes |
| Part C - Actual Production History (APH) | | | | COC use only | |
| 11. APH Crop Year | 12. Planted Acres | 13. Actual | | 14. | |

[4] Mutual's webpage states, "Formed in 1948, Florida Citrus Mutual operates on the cooperative philosophy that together we can accomplish more. Led by a board of 21 member-elected directors, Mutual is a voluntary cooperative association dedicated to helping Florida citrus growers produce and market their crops at a profit. Mutual is looking out for the best interest of growers every day." *See* https://flcitrusmutal.com.

| | | Production | yield |
|---|---|---|---|
| 2017 | 1020 | 228833 | 224.35 |
| 2016 | 1053 | 133168 | 126.47 |
| 2015 | 947 | 140829 | 148.71 |
| 2014 | 927 | 173877 | 187.57 |
| 2013 | 1103 | 386903 | 350.77 |
| Part D - Approved Yield (COC Only) | | | |
| 15. Total Yield (Item 14) 1037.87 divided by | 16. No of APH Crop Years (Item 11) 5 | 17. Calculated Yield 207.57 | |

(Agency Record, page 70)

11. To calculate RMR's WHIP payment, the County Office Committee (COC) used RMR's 5-year average APH yield equaling 207.57 boxes per acre for its Valencia crop. The COC first multiplied RMR's 1,097.200 Valencia acres by the 5-year average expected yield of 207.57 boxes per acre, and the product equaled 227,745.804 boxes.[5] The COC multiplied this product by the $10.4167 price per box for processed oranges in the National Crop Table (NCT), and the results equaled $2,372,359.72. The COC multiplied this result by a WHIP payment factor of 70 percent, which produced a WHIP expected value before the hurricane equaling $1,660.651.80.[6] Next, the COC multiplied RMR's actual production of Valencia processed oranges equaling 215,475 boxes by the same NCT price of $10.4167 a box, and the product resulted in RMR's actual crop value after the hurricane equaling $2,244,538.43. Finally, the COC subtracted RMR's actual crop value from its WHIP expected crop value, and the difference equaled a negative $583,886.63. (Hearing Audio, Track 2, 03:00-20:00; Agency Record, pages 9-12, 70-76)

12. Because RMR's crop insurance policy and its Agency acreage reports listed the intended use of its crop as processed, and RMR sold some of its production after Hurricane Irma as fresh, the COC determined that the production sold as fresh had a secondary use dollar value. The COC calculated RMR's secondary use value by multiplying the number of fresh boxes that RMR sold, which equaled 16,632 boxes, by the NCT price for Valencia oranges fresh, $13.20 a box, and the COC determined that that the sum of RMR's secondary use value equaled $219,542. Because the WHIP regulations require the Agency to determine the final WHIP

[5] The calculation sheet in the Agency's Record indicates that it used the CEY of 215 boxes per acre, but the Agency explained during the second hearing that it used 207.57 boxes per acre to calculate RMR's yield, which is consistent with the final calculations in the Agency's record. (Hearing Audio, Track 2, 02:35-06:18)

[6] Pursuant to 7 C.F.R. § 760.1511(b), because RMR had catastrophic level dollar plan coverage for its citrus crop, the Agency was required to use a 70 percent WHIP factor in calculating RMR's WHIP payment.

payment by subtracting the secondary use or salvage value of the crop from the final amounts in the preceding paragraph, the COC subtracted $219,542 from a negative $583,886.63, and the COC determined that RMR did not qualify for any WHIP payments for the loss of its Valencia crop because the results equaled a negative $803,429.[7] (Hearing Audio, Track 1, 01:43:40-02:09:39; Hearing Audio, Track 2, 06:30-10:45)

13. On February 14, 2019, the Agency's County Executive Director (CED) received RMR's letter requesting to appeal the COC's payment decision. RMR explained that the COC did not calculate its loss accurately because the COC relied solely on RMR's 5-year production history. RMR requested that the CED allow it to prove its actual losses because its loss adjusters' report indicated that it suffered a 40.7 percent loss. (Agency Record, page 6)

14. On July 25, 2019, the CED informed RMR that the COC's payment decision was not appealable. (Agency Record, page 2)

15. On August 25, 2019, RMR sent a letter to the Agency's State Executive Director (SED) requesting that she reverse the CED's non-appealability determination and the COC's decision. RMR explained that it had verifiable and reliable records of its production based on its crop appraisal. RMR explained that the COC's decision to not include its fresh crop in its production but subtract its dollar value as a secondary use crop was incorrect. RMR explained that it did not sell any of its Valencia fresh crop for salvage or secondary use. (Appellant Exhibit A, pages 1-11)

16. On September 23, 2019, the SED sent a letter to RMR stating that all Florida citrus growers had dollar plans which did not keep records of yields for APH purposes. The CED informed RMR that the Florida citrus growers were the only WHIP applicants nationwide, who had dollar plans, that were not required to accept the CEY for calculating WHIP benefits. The CED informed RMR that the Florida citrus growers were given the opportunity to certify their actual production for the five previous years, and those certifications were meant to capture a more realistic expected yield for groves that had losses due to Hurricane Irma. The CED informed RMR that the CED's and COC's determinations were not appealable. (Appellant Exhibit B, pages 1-2)

17. On October 25, 2019, the National Appeals Division (NAD) received RMR's request for NAD to determine whether the Agency's decision was appealable. NAD informed RMR that the Agency's decision was appealable to NAD. NAD

[7] RMR also filed NOLs for its other citrus crops, but it only challenges the WHIP payment calculations for its Valencia crop. (Agency Record, pages 9-11)

accepted RMR's appeal and determined that it was filed on November 6, 2019. (NAD File 1, Tab 2, 4)

**DISCUSSION**

Part 11 of 7 C.F.R. governs the appeal. Title 7 C.F.R. Part 760 Subpart O (July 18, 2018) supplemented by the Agency's handbook or HB 1-WHIP (July 13, 2018) both govern the substantive issues on appeal.

**Did the Agency apply the correct rules and regulations when it calculated RMR's WHIP payment? No.**

WHIP assistance is available to eligible producers for crops, trees, bushes and vines which suffered losses because of the consequences of Hurricanes Harvey, Irma, Maria, and other hurricanes and wildfires occurring in calendar year 2017. *See* 7 C.F.R. § 760.1508 and HB 1-WHIP Par. 6A and Par. 210 (July 13, 2018). WHIP payments are calculated on a crop by crop basis, for all acreage of the crop within the unit (not just acreage affected by a hurricane or wildfire). *See* HB 1-WHIP Par. 210A. WHIP pays for losses on crops that were insured, covered by the Non-Insured Disaster Assistance Program (NAP), or uninsured. *See* HB 1-WHIP Par. 210A. WHIP has three payment calculations that are based on production losses, loss of value loss crops, or loss of trees, bushes, and vines. *See* HB 1-WHIP Par. 210A. Each payment calculation has a specific method to get to WHIP's calculation of expected value multiplied by a WHIP factor minus actual value minus salvage or secondary use value minus indemnity. *See* HB 1-WHIP Par. 210A. Expected value is the revenue the producer would have received if the crop was harvested based on historical yields. *See* HB 1-WHIP Par. 210B. Actual value is the revenue received for the crop unit's production for the intended use and coverage period. *See* HB 1-WHIP Par. 210B. The WHIP factor is determined based on the level of coverage elected by the producer, for the crop, type, intended use, and planting period. *See* 7 C.F.R. § 760.1511(b) and HB 1-WHIP Par. 210B. The Agency's regulations provide a roadmap for the COC to follow to calculate WHIP assistance for yield based crops such as Valencia oranges.[8] *See* 7 C.F.R. § 760.1516 and HB 1-WHIP Par. 210-211.

[8] Seven C.F.R. § 760.1511 states, "(a) Payments made under this subpart to a participant for a loss to yield-based crops, including losses due to prevented planting, subject to § 760.1514(i) and (j), are determined for a unit by: (1) Multiplying the eligible acres by the 2017 WHIP yield in paragraph (c) of this section or the WHIP yield in paragraph (d) of this section by the price; (2) Multiplying the result from paragraph (a)(1) of this section by the applicable 2017 WHIP factor or WHIP factor in paragraph (b) of this section; (3) Multiplying the applicable production in paragraph (d) of this section by the price; (4) Subtracting the result from paragraph (a)(3) of this section from the result of paragraph (a)(2) of this section; (5) Multiplying the result from paragraph (a)(4) of this section by the participant's share in paragraph (e) of this section; (6) Multiplying the result from paragraph (a)(5) of this section by the applicable payment factor in paragraph (f) of this section; (7) Subtracting the amount of the gross insurance indemnity

There is no dispute in this case that (1) the Florida citrus industry was adversely affected by citrus greening; (2) Mutual lobbied for a special provision in the WHIP regulations on behalf of Florida citrus growers; (3) RMR and some producers used innovative farming practices to combat citrus greening; and (4) RMR's innovative farming practices initially reduced its yield but have now "paid off," and its current Valencia production has substantially increased. (Hearing Audio, Track 1, 11:10-14:00; Hearing Audio, Track 2. 20:21-23:10; FOF 4-5) There is also no disagreement in this case that there are two sections of the WHIP regulations that apply to Florida citrus growers only. The first section is in the definition section in 7 C.F.R. § 760.1502, where it states the following:

> 2017 WHIP yield means, for a unit:
>
> (1) For an insured crop, excluding crops located in Puerto Rico, the approved federal crop insurance APH, for the disaster year;
>
> (2) For a NAP covered crop, excluding crops located in Puerto Rico, the approved yield for the disaster year;
>
> (3) For a crop located in Puerto Rico or an uninsured crop, excluding citrus crops located in Florida, the county expected yield for the disaster year; and
>
> (4) *For citrus crops located in Florida, the yield based on documentation submitted according to § 760.1511(c)(3), or if documentation is not submitted, the county expected yield.* (emphasis added)

The second section is under the heading "Calculating payments for yield-based crops." *See* 7 C.F.R. § 760.1511. Section 760.1511(c) states the following:

> The 2017 WHIP yield is:
>
> (1) The producers APH for insured crops under a crop insurance policy that has an associated yield and NAP covered crops, excluding all crops located in Puerto Rico;
>
> (2) The county expected yield for crops located in in Puerto Rico and uninsured crops, excluding citrus crops located in Florida; or
>
> *(3) For uninsured citrus crops located in Florida:*
>
> *(i) Determined based on information provided on FSA-893 and supported by evidence that meets the requirements of § 760.1313(c), or*

---

or NAP payment from the result from paragraph (a)(6) of this section; (8) Subtracting the secondary use or salvage value of the crop from the result from paragraph (a)(7) of this section."

> (ii) *If FSA-893 and supporting information are not submitted, the county expected yield.* (emphasis added)

*See* 7 C.F.R. § 760.1511(c)(3). The parties in this case expressed different views on whether the Agency used the correct regulations to calculate RMR's WHIP payment.

The CED argues that the COC was required to rely solely on RMR's 5-year average APH to calculate its WHIP payment. The CED testified that 7 C.F.R. § 760.1511(c)(3)(i) instructs the COC to use the information in the FSA-893 to calculate a WHIP yield. The Agency interprets this section of the regulation in 1-WHIP Paragraph (Par.) 100C where it instructs the COC to determine the yield for production-based crops for all Florida citrus crops by using up to 5 years of historical production records. Also, HB 1-WHIP Par. 188A states, "Because of the type of insurance policies administered in Florida for citrus, yields will be calculated using the simple average of the previous 5 years production and acreage history documented on FSA-893." The CED explained that the type of crop insurance policies administered in Florida are dollar plans, which are revenue-based policies that do not have an established yield and/or price. *See* HB 1-WHIP Par. 186A- *Definition of Dollar Plans*. The CED points out that since RMR is a Florida citrus grower, RMR has dollar plans for its Valencia crop, and because Mutual lobbied for Florida citrus growers to use their average 5-year APH yield instead of the CEY, the Agency had to use RMR's average 5-year APH yield of 207.57 boxes per acre for its Valencia processed oranges to calculate its WHIP payment. (FOF 11) The CED argues that the documents in the record indicate that the COC followed the calculation methods applicable to yield based on crops found in 7 C.F.R. § 760.1511(c)(3). (Hearing Audio, Track 1, 19:30-19:40, 01:43:40-01:53:57; FOF 9, 11-12).

Conversely, RMR points out that the plain language in 7 C.F.R § 760.1511(c)(3) indicates that it applies to uninsured Florida citrus crops where it states, "For uninsured circus crops located in Florida." RMR points out that its crops were insured. (FOF 3) RMR also points out that § 760.1511(c)(3) instructs the Agency to determine the 2017 WHIP yield for insured crops using form FSA-893, and the same section of the regulation refers the Agency to § 760.1513(c) to determine production. RMR points out that § 760.1513(c) does not apply to RMR because this section of the regulation states, "For all crops eligible for loan deficiency payments or marketing assistance loans (see parts 1421 and 1434 of this title) with an intended use of grain but harvested as silage, ensilage, cabbage, hay, cracked, rolled, or crimped, production will be converted to a whole grain equivalent based on conversion factors as previously established by FSA." RMR contends that it is "unequivocally clear" that § 760.1511(c)(3) does not apply to RMR's insured crops nor do any of the Agency's handbook provisions intended to provide guidance on the application of §760.1511(c)(3).

In response to RMR's arguments, the CED testified that she does not dispute that 7 C.F.R. § 760.1511(c)(3) indicates that it applies to uninsured citrus crops in Florida and

RMR had insured crops. Nevertheless, she explained that the COC did not have any guidance on how to proceed if it limited the Florida citrus provisions to only uninsured citrus crops, and the definition of the 2017 yield found in 7 C.F.R. § 1502 does not separate Florida insured citrus from Florida uninsured citrus.

The undisputed facts in this case indicate that RMR had insured crops, even if they were insured by dollar plans that did not track yields for APH purposes. I note that 7 C.F.R. § 1511(c)(3) indicates that it applies to uninsured crops. The requirement that the Agency use form FSA-893 to project a WHIP yield for Florida citrus growers is only under the section of the regulation that applies to uninsured crops. Therefore, I agree with RMR's argument that 7 C.F.R. § 1511(c)(3) should not apply to its insured crops because insured crops are not included in the plain language of the regulation. RMR's argument and reasoning are sound because they are consistent with a principle or maxim of statutory construction known as "expressio unius est exclusio alterius," which is a Latin phrase that means the express mention of one thing excludes all others. Having reviewed both parties' arguments and the applicable rules and regulations, I conclude that the Agency failed to apply the correct rules and regulations when it calculated RMR's WHIP payment.

**Was RMR's average yield from its 5-year APH the best data available to the Agency to calculate RMR's WHIP payment? No.**

The Agency will use the best data available to calculate a 2017 WHIP payment at the time 2017 WHIP payments are calculated. *See* 7 C.F.R. § 760.1505(h). RMR contends that its 5-year production history did not accurately reflect its yield potential because citrus greening reduced its historical yields, but its current yield trend is increasing substantially. RMR points out that although Mutual lobbied to help Florida citrus growers with declining yields, RMR is not a member of Mutual, and Mutual's efforts did not help RMR because its yields have been consistently increasing. (FOF 5) RMR contends that the drafters of the WHIP regulations probably were aware that using only one approach to calculate yields for producers with unique circumstances could result in harsh and inaccurate payment calculations, which explains why the WHIP regulations also state in §760.1505(h) that "FSA will use the best data available to calculate a 2017 WHIP payment at the time 2017 WHIP payments are calculated." RMR contends that the COC's calculations are incorrect because the COC failed to use the best data available to calculate its WHIP payment. RMR contends that the best data available to calculate its WHIP payment is its loss adjusters' appraisal report. RMR argues that the Agency should have used its crop adjusters' appraisal report to calculate its WHIP payment "to capture a more realistic expected yield for growth on acres that had losses of production due to Hurricane Irma."

RMR also points out that the WHIP regulations indicate that the Agency is not limited to the definitions in § 760.1502 to calculate APH. RMR refers the reader to the first sentence in 7

C.F.R. § 1502 where it states that the definitions in "§§ 718.2 and 1400.3 of this title also apply, except where they conflict with the definitions in this section. In the event of conflict, the definitions in this section apply." *See* 7 C.F.R. § 760.1502. RMR also refers the reader to the definition of "Approved Yield" in 7 C.F.R. § 760.1502 because it supports its argument that the COC could have used RMR's appraisal report to determine APH under 7 C.F.R. Part 400, Subpart G.

I recognize that the CED explained that the Agency's definition of the 2017 yield in § 760.1502 does not distinguish between insured crops and uninsured crops, and the only calculation methods available to the COC for Florida citrus growers are in 7 C.F.R. § 760.1511(c)(3). But even if the COC had to review RMR's yield by considering RMR's FSA-893 historical information, the Agency's handbook provides the COC with the discretion to disregard information in a FSA-893 if it determines that the information is questionable. This guidance can be seen in HB 1-WHIP Par. 188B where it states,

> "Participants will certify production by providing up to 5 years of production harvested and acres grown. This is a certification and records are not required; however, *the resulting yields are subject to spot check and COC has the authority to request supporting documentation for any yields that appear to be inconsistent with other participants*." (emphasis added)

I agree with RMR's argument that the COC had the authority to consider its crop appraisal report because its argument is supported also by the WHIP regulations. Specifically, under the heading "General provisions," in 7 C.F.R. § 760.1505, the regulations state, "FSA county committees will make the necessary adjustments to assign production or reduce the 2017 WHIP yield when the committee determines: (1) An acceptable appraisal or record of harvested production does not exist." *See* 7 C.F.R. § 760.1505(b)(1). In the present case, had the COC considered RMR's appraisal report, it would have been evident that RMR's FSA-893 did not accurately reflect its yield potential. I conclude that the Agency erred in relying solely on RMR's simple average of its 5-year APH to project its WHIP payment.

**Did the Agency correctly deduct the dollar amount of RMR's crop sold as fresh because it was a secondary use crop? Yes.**

Secondary use is applicable when eligible crop acreage reported with a particular intended use is harvested and the harvested production is sold through a different market. *See* HB 1-WHIP Par. 116A. The sum of the dollar amount for all crops sold as secondary use will be included in calculating WHIP. *See* HB 1-WHIP Par. 116A. The loss of quality that resulted in the commodity being marketed in a secondary use market must be because of eligible disaster conditions. *See* HB 1-WHIP Par. 116A. Secondary use is not salvage, and it is not counted as production of the crop for any purpose. *See* HB 1-WHIP Par. 116A.

RMR argues that its Valencia production should have been higher than the amount that the Agency calculated. RMR argues that the Agency erred when it failed to include its production sold as fresh with its processed production. RMR contends that this error occurred because the Agency determined that after the hurricane, RMR sold some of its crop as fresh, which was not the intended use of its acreage listed in its crop insurance policy or on the Agency's documents. (FOF 3, 4)

I note that in this case, the Agency applied a secondary use dollar value to RMR fresh crop and deducted the sum of the dollar amount from its WHIP payment. (FOF 12) RMR contends that its fresh crop did not meet the Agency's definition of a secondary use crop because its fresh crop did not lose its value because of Hurricane Irma, and the NCT price for its fresh production was higher at $13.20 a box instead of the lower NCT price of $10.4167 a box for its processed production. But I also note that RMR does not dispute that all of its Valencia oranges are grown on the same acreage and trees as its processed crop, and the market conditions determine whether RMR sells some of its processed crop in a different market as fresh. (FOF 2). The record also reflects that RMR insured all of its Valencia acreage under the intended use as processed. (FOF 3, 4) I note that the Agency's handbook requires that it use the intended use of the crop at the time of planting as reflected on the Agency's forms to calculate a WHIP payment. *See* HB 1-WHIP Par. 3 Exhibit 4A Item 6D.

The Agency's handbook also defines a multiple market crop as a crop that can have multiple markets or intended uses with separate market prices established for each use. *See* HB 1-WHIP Par. 181A. Oranges are included in the Agency's list of multiple market crops. *See* HB 1-WHIP Par.181B. The same handbook section states that for multiple market crops, "the WHIP expected value will be determined based on the intended use, and the actual value will be determined using the production to count sold for the intended use." *See* HB 1-WHIP Par. 181C and D. The WHIP handbook also states, "The producer must provide records of all production marketed to secondary uses or sold as salvage. The value of any product sold in a secondary market will be calculated using the NCT price for that use and loaded as a secondary use in the WHIP application process." *See* HB 1-WHIP Par. E. The Agency's handbook is consistent with its WHIP regulation where it states, "For loss calculations, the participant's unit structure will be (1) For an insured crop, the participants existing unit structure established in accordance with part 457of this title."

I recognize that RMR's fresh crop does not meet the strict definition of a secondary use crop because its fresh crop's value was not reduced by Hurricane Irma. But the Agency's rules also state, "For WHIP, only a single intended use for the acreage will be included in the WHIP calculation of production. Any other intended use of the crop on the same acreage will not be eligible for WHIP and production will not be counted. If more than one intended use on the same acreage exists, the participant will choose which intended

use will have the WHIP benefits." *See* HB 1-WHIP Par. 182B and 7 C.F.R. § 760.1505(a)-(1). RMR elected to cover all of its Valencia acreage as processed, and the Agency's rules state that "the unit qualifying loss will be paid for the reported intended use, and the secondary use value will be determined by the COC using the NCT price and deducted from the WHIP payment calculated for the crop acreage of the commodity, which gave rise to the intended and secondary use." *See* HB 1-WHIP Par. 116B. Seven C.F.R. § 760.1511(a)(8) requires that the Agency subtract the secondary use or salvage value of the crop in calculating the final WHIP payment. Based on the facts and rules that apply to determining production, I conclude that the Agency correctly followed its rules in determining that RMR's fresh crop was a secondary use crop.

**What are RMR's arguments for equitable relief?**

In addition to the above-mentioned arguments, RMR argues that its production is increasing, and the $0 WHIP payment in the Agency's calculations does not accurately reflect its loss that exceeded 2 million dollars. (FOF 5, 7) RMR argues that its loss adjusters' appraisal report clearly shows that it lost 40 percent of its Valencia crop due to Hurricane Irma, and its appraisal report shows that its production did not match its historical yields in its FSA-893. (FOF 5, 7) RMR argues that when growers have declining yield trends, losses predicted by APH are higher than actual losses, but the opposite occurs when growers have increasing yield trends because losses are minimized by APH, as in the case for RMR. (FOF 7) RMR further explains that it does not challenge the use of the 5-year average APH that benefits growers with declining yields, but it argues that the misapplication of a 5-year average "resulted in an entirely unrealistic loss calculation for RMR." RMR points out that the purpose of the WHIP is to assist producers who suffered losses due to hurricanes like Irma, and the Agency's approach has produced the opposite effect.

I sympathize with RMR's arguments, and I recognize that it essentially argues that a "one-size-fits-all" approach to projecting yields is not supported by the WHIP rules or regulations. I agree with RMR's view of the WHIP regulations. In this case, I have determined that the Agency erred in not considering RMR's appraisal report in calculating its expected yield. But I have also determined that the Agency correctly determined that RMR's production sold as fresh was a secondary use crop. If RMR desires equitable relief, I do not have the authority to grant or deny its request. In accordance with 7 C.F.R. § 11.9(e), the NAD Director has the authority to grant equitable relief to the same extent such authority is provided an agency.[9] Although I have not determined RMR's equitable relief request, I have developed the record to enable the NAD Director to make a determination as to whether he should grant equitable relief. If RMR wishes to request equitable relief, it should make the request by filing a request for NAD Director Review according to the instructions on the attached pages.

[9] Seven C.F.R. § 718.307(a) provides the Agency's SEDs with the authority to seek and grant equitable relief.

**DETERMINATION**

Seven C.F.R. § 11.8(e) provides that an appellant bears the burden of proving that an agency's adverse decision is erroneous by a preponderance of the evidence. In this case, RMR has met this burden. The Agency decision is erroneous.

This is a final determination of the Department of Agriculture unless a party timely files a request for review.

Dated and mailed this 5th day of February 2020.

RICHARD B. CATO
NAD Administrative Judge

Attachments:
Notice of Right to Request Director Review and/or Copy of Audio Recording
Request for Director Review

Distribution of copies to:

Appellant:
Rolling Meadow Ranch Groves LLC
Matthew Machata
6449 Camp Mack Road
Lake Wales, FL 33898

Appellant's Representative:
John L. Wharton
Attorney at Law
Dean, Mead & Dunbar
215 S. Monroe Street, Suite 815
Tallahassee, FL 32301

The National Appeals Division has sent an electronic notice with an attached copy of this determination to the FSA Appeals and Litigation Staff. The mailing address for FSA is as follows:

Agency Appeals Coordinator:
USDA, Farm Service Agency

Tom Hockert
PO Box 141030
Gainesville, FL 32614

## NOTICE OF RIGHT TO REQUEST DIRECTOR REVIEW AND/OR COPY OF AUDIO RECORD

### DIRECTOR REVIEW REQUEST

Either party may request that the Director of the National Appeals Division (NAD) review this determination. A suggested format is attached, but any request is acceptable if it has all the information in the "Instructions for Request for Review" listed below.

**An appellant or third party** who believes that this determination is wrong must file a request for Director review within **30 days** of receipt of this determination. Unless appropriate documentation shows otherwise, the Director presumes that it usually takes 7 days for a determination to reach an appellant by mail. However, the Director will accept requests filed more than 37 days from the date of the determination if the person shows that receipt of the determination took longer than usual. A request must be in writing and be signed by the appellant or third party. A request must also follow the "Instructions for Request for Review" listed below.

**The agency** may also file a request for Director review if it believes this determination is wrong. The agency must file its request within **15 business days** of receipt of this determination. The head of the agency or someone acting in that capacity must sign the request. The agency must also follow the "Instructions for Request for Review" listed below.

Parties may file written responses to a request for Director review within **5 business days** of receipt of a copy of the request for review.

The date a document is considered "filed" is either the date it is delivered in writing to NAD, its postmark date, or the date that a complete facsimile copy is received by NAD.

**Instructions for Requests for Review**

A request for review must include the following information:

- be personally signed and dated by appellant, third party or head of the agency;
- specifically request a review;
- give the case number for the Hearing Officer determination (the case number is on the top right-hand side of the first page of the determination);
- note the date the requester received the Hearing Officer determination;
- say why the determination is wrong;
- confirm that the requester has also sent a copy of the request and additional information, if any, to the other party at the same time that the request was sent to NAD; and
- be mailed, faxed or delivered by commercial delivery service to:

Mailing Address:

National Appeals Division
Regional Office
P.O. Box 1508
Cordova, TN 38088

Physical Address:

National Appeals Division
57 Germantown Court, Suite 203
Cordova, TN 38018

Fax Number: 1-855-438-8034
Phone Number: 1-800-552-5377
TDD Number: 1-800-627-8332

NAD Website: www.nad.usda.gov

**COPY OF AUDIO RECORD REQUEST**

The appellant(s), third parties, and the agency may obtain a copy of the audio record made of the pre-hearing/hearing proceedings at no cost. Copies may be obtained by making a written request to the NAD Regional Office

**REQUEST FOR DIRECTOR REVIEW**

I/We, *(print* name(s)) ______________________________, am/are the Appellant(s)/Third Party/Agency head in the above-referenced appeal and I/we request a Director review of the appeal determination in this case.

The case number is: ___________________________.

I/We received the appeal determination on _________________.

The specific reasons why I/we believe the appeal determination is wrong are: (The requester may attach additional sheets and documents, if desired.)

A copy of this request, along with any attachments, was mailed to the other parties on _________________.

I swear that all statements in this filing are true to the best of my knowledge and belief.

_____________________________________________ ________________________

**Appellant(s)/Third Party/Agency head signature(s)** **Date**